**No. 25-10824**

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

ANNIE M.; COURTNEY M.; SPENCER M.,

*Plaintiffs-Appellants,*

v.

ALEDO INDEPENDENT SCHOOL DISTRICT,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of Texas, No. 4:24-CV-564
Hon. Terry R. Means, U.S. District Judge

## OPENING BRIEF FOR
## PLAINTIFFS-APPELLANTS

Caroline Jozefczyk
KING & SPALDING LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202
(912) 596-0282

Nicholas A. Mecsas-Faxon
KING & SPALDING LLP
1700 Pennsylvania Ave. NW
Washington, DC 20006
(202) 737-0500

Sarah V. Warburg-Koechlin
 *Counsel of Record*
KING & SPALDING LLP
2601 Olive Street
Suite 2300
Dallas, TX 75201
(214) 764-4410
swarburg-koechlin@kslaw.com

*Counsel for Plaintiffs-Appellants*

September 30, 2025

## Certificate of Interested Persons

**Case Number and Style:**

No. 25-10824, *M. v. Aledo*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**I. District Court Judges:**

Hon. Terry R. Means, U.S. District Judge

**II. Plaintiffs-Appellants:**

1.  Annie M.

2.  Courtney M.

3.  Spencer M.

*Counsel for Plaintiffs-Appellants:*

Caroline Jozefczyk
KING & SPALDING LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202
(912) 596-0282
cjozefczyk@kslaw.com

Sarah V. Warburg-Koechlin
*Counsel of Record*
KING & SPALDING LLP
2601 Olive Street
Suite 2300
Dallas, TX 75201
(214) 764-4410
swarburg-koechlin@kslaw.com

Nicholas A. Mecsas-Faxon
KING & SPALDING LLP
1700 Pennsylvania Ave. NW
Washington, DC 20006
(202) 737-0500
nmecsas-faxon@kslaw.com

## III. Defendant-Appellee:

1. Aledo Independent School District

*Counsel for Defendants-Appellees*

Kelly Janes
WALSH GALLEGOS KYLE
ROBINSON & ROALSON, P.C.
505 E. Huntland Drive
Suite 600
Austin, TX 78752
(512) 454-6864
kjanes@wabsa.com

Meredith Prykryl Walker
*Counsel of Record*
WALSH GALLEGOS KYLE
ROBINSON & ROALSON, P.C.
105 Decker Court
Suite 700
Irving, TX 75062
(214) 574-8800
mwalker@wabsa.com

## IV. Entities with a Financial Interest:

1. None

ii

Dated: September 30, 2025

*s/Sarah V. Warburg-Koechlin*
Sarah V. Warburg-Koechlin
*Counsel for Plaintiffs-Appellants*

## Statement Regarding Oral Argument

Plaintiffs-Appellants request oral argument. This case presents complex issues, including a novel question of whether parents can limit their consent to evaluation for special education services in any way under the Individuals with Disabilities Education Act, or if school districts can instead demand all-or-nothing consent from parents in order to evaluate a student and provide those services. Plaintiffs-Appellants respectfully submit that oral argument would aid the Court in resolving this question and other issues in this appeal.

# Table of Contents

Certificate of Interested Persons .................................................................i

Statement Regarding Oral Argument ......................................................iv

Table of Authorities ................................................................................vii

Introduction ...............................................................................................1

Jurisdiction ................................................................................................5

Statement of the Issues.............................................................................5

Statement of the Case ...............................................................................6

    A.    The federal framework for education of individuals with disabilities .................................................................6

        1.    IDEA .......................................................................6

        2.    ADA .........................................................................9

    B.    IQ testing methods................................................................11

    C.    Annie's story ..........................................................................14

        1.    Annie's immense initial challenges...........................14

        2.    Seeking services through AISD..................................16

        3.    The notice of evaluation............................................18

    D.    Procedural history.................................................................20

        1.    Due process complaint and resolution session ...........20

        2.    Due process hearing and decision ..............................22

        3.    The federal lawsuit .....................................................24

Summary of Argument............................................................................26

Argument ................................................................................................31

I.    The district court erred in concluding that IDEA does not permit partial parental consent to an initial evaluation and that Annie's parents thus did not provide consent.........................31

    A.    The district court erred in concluding that IDEA does not permit partial consent to an initial evaluation ..............32

        1.    The text of the IDEA regulations supports not confining "consent" to "full consent" ............................33

        2.    Case law supports a non-restrictive approach to consent under the IDEA ...............................................35

        3.    Partial parental consent aligns with the IDEA's commitment to parental involvement...........................40

    B.    Partial consent was granted with respect to cognitive testing only—full consent was given to evaluating in all suspected areas of disability............................................42

II.    The district court erred in determining that AISD did not violate the ADA ...........................................................................46

    A.    The district court erroneously conflated IDEA compliance with ADA compliance .........................................47

    B.    This district court wrongly required proof of intentional discrimination ...................................................52

    C.    AISD violated the ADA.......................................................54

Conclusion....................................................................................................60

Certificate of Service

Certificate of Compliance

# Table of Authorities

**Cases**

*A.H. ex rel. A.H. v. Clarksville-Montgomery Cnty. Sch. Sys.*,
  2019 WL 483311 (M.D. Tenn. Feb. 7, 2019) ..........................35, 36, 37

*A.J.T. ex rel. A.T.*
  *v. Osseo Area Schs., Indep. Sch. Dist. No. 279*,
  605 U.S. 335 (2025) ................................................................*passim*

*Alexander v. Choate*,
  469 U.S. 287 (1985) ..........................................................................11

*Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*,
  267 F.3d 877 (9th Cir. 2001) ............................................................41

*Ball v. LeBlanc*,
  792 F.3d 584 (5th Cir. 2015) ...........................................48, 56, 57, 58

*Bennett-Nelson v. La. Bd. of Regents*,
  431 F.3d 448 (5th Cir. 2005) ............................................................56

*Board of Educ. of Hendrick Hudson*
  *Cent. Sch. Dist. v. Rowley ex rel. Rowley*,
  458 U.S. 176 (1982) .......................................................................8, 45

*Briere ex rel. Brown v. Fair Haven Grade Sch. Dist.*,
  948 F. Supp. 1242 (D. Vt. 1996) .......................................................42

*Cadena v. El Paso County*,
  946 F.3d 717 (5th Cir. 2020) ............................................................58

*Chupka ex rel. C.C. v. Pflugerville Indep. Sch. Dist.*,
  2022 WL 1056101 (5th Cir. Apr. 8, 2022) .........................................54

*Delano-Pyle v. Victoria County*,
  302 F.3d 567 (5th Cir. 2002) ............................................................59

*G.J. ex rel. E.J. v. Muscogee Cnty. Sch. Dist.*,
  704 F. Supp. 2d 1299 (M.D. Ga. 2010) .............................................39

*Glass v. Paxton*,
  900 F.3d 233 (5th Cir. 2018) ................................................. 55

*Guckenberger v. Bos. Univ.*,
  974 F. Supp. 106 (D. Mass. 1997) ................................. 11, 47

*Hale v. King*,
  642 F.3d 492 (5th Cir. 2011) ............................... 47, 52, 55

*J.B. ex rel. L.B. v. Kyrene Elementary Sch. Dist. No. 28*,
  112 F.4th 1156 (9th Cir. 2024) ........................................ 42

*J.V. ex rel. Veldhuyzen v. Stafford Cnty. Sch. Bd.*,
  792 S.E.2d 286 (Va. Ct. App. 2016) ................................. 37

*King v. Our Lady of the Lake Hosp., Inc.*,
  455 F. Supp. 3d 249 (M.D. La. 2020) ............................... 53

*M.H. v. Nassau Cnty. Sch. Bd.*,
  918 So.2d 316 (Fla. Dist. Ct. App. 2005) ......................... 38

*Miraglia v. Bd. of Supervisors of La. State Museum*,
  901 F.3d 565 (5th Cir. 2018) ....................... 52, 53, 56, 59

*Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*,
  759 F.3d 698 (7th Cir. 2014) ........................................... 57

*Schaffer ex rel. Schaffer v. Weast*,
  546 U.S. 49 (2005) ......................................... 8, 31, 40, 41

*Smith v. Harris County*,
  956 F.3d 311 (5th Cir. 2020) .................................... *passim*

*T.O. v. Fort Bend Indep. Sch. Dist.*,
  2 F.4th 407 (5th Cir. 2021) ....................................... 47, 53

*Town of Burlington v. Dep't of Educ.*,
  736 F.2d 773 (1st Cir. 1984) ........................................... 41

*Vanderlan v. United States*,
  135 F.4th 257 (5th Cir. 2025) ......................................... 33

viii

**Statutes**

20 U.S.C. § 1400(c)(1) ..............................................................3, 6

20 U.S.C. § 1414(b) ........................................................ 7, 28, 42

20 U.S.C. § 1415(i)(2) ...................................................................5

20 U.S.C. § 1415(*l*) ........................................................... *passim*

28 U.S.C. § 1291...........................................................................5

28 U.S.C. § 1331...........................................................................5

29 U.S.C. § 794.......................................................................5, 46

42 U.S.C. § 12101(a) ................................................................9, 10

42 U.S.C. § 12102.................................................................... 50, 57

42 U.S.C. § 12131.................................................................... 10, 50

42 U.S.C. § 12132...................................................................... 10

42 U.S.C. § 12133..........................................................................5

42 U.S.C. § 12182(b) .................................................................. 11

Tex. Penal Code § 16.02(c)(4) ..................................................21

**Regulations**

28 C.F.R. § 35.108(a) ................................................................ 50

28 C.F.R. § 35.130(b) ................................................................ 58

28 C.F.R. § 36.103...................................................................... 11

34 C.F.R. § 104.43...................................................................... 11

34 C.F.R. § 104.44...................................................................... 11

34 C.F.R. § 300.9........................................................ 26, 27, 33, 34

34 C.F.R. § 300.114(a) ..................................................................8

34 C.F.R. § 300.300 *et seq.*............................................................2

34 C.F.R. § 300.300(a) ...........................................................*passim*

34 C.F.R. § 300.300(c)..................................................................7

34 C.F.R. § 300.300(d) ............................................................8, 42

34 C.F.R. § 300.301(a) ..................................................................7

34 C.F.R. § 300.304(b) ..................................................................7

34 C.F.R. § 300.304(c) ..................................................................7

45 C.F.R. § 164.508(c)................................................................35

## Other Authorities

*About Aledo ISD* (2025),
https://www.aledoisd.org/about-aledo-isd/about-aledo-isd................15

*Aledo ISD Special Programs Family Resources*,
https://sites.google.com/aledoisd.org/parent-
resources/home................................................................16

Allen, Silas
*Aledo ISD violated special education laws, state
investigation finds*, Fort Worth Star-Telegram
(Sept. 4, 2025), https://www.star-
telegram.com/news/local/fort-
worth/crossroads/article311885126.html............................................5

*Early Childhood Assessment:
Utility of the WJ IV ECAD®,* Riverside Insights
(Dec. 2, 2021), https://blog.riversideinsights.com/early-
childhood-assessment-wjiv-ecad.......................................................12

LaForte, Erica M., et al.,
  Assessment Service Bulletin Number 4: Woodcock-
  Johnson® IV Tests of Early Cognitive and Academic
  Development: Overview and Technical Abstract (2015) .................... 12

First Five Years Fund,
  *IDEA Early Intervention and Preschool Programs*
  (July 29, 2019), https://www.ffyf.org/resources/2019/07/
  idea-early-intervention-and-preschool-programs/ ............................... 9

Schrank, F.A., & B.J. Wendling,
  *Abstract*, The Woodcock-Johnson IV Tests of Early
  Cognitive and Academic Development, *in* Contemporary
  Intellectual Assessment: Theories, Tests, and Issues 283
  (D.P. Flanagan & E.M. McDonough eds., 4th ed. 2018) .................... 12

U.S. Dep't of Educ.,
  *About IDEA*, https://sites.ed.gov/idea/about-idea/ ............................... 6

Voress, Judith K., et al.,
  Developmental Assessment of Young Children
  (2d ed. 2012) ................................................................................. 18

*WPPSI Scores |*
  *Understand Your Child's WPPSI Test Scores* (2025),
  https://www.testingmom.com/tests/wppsi-test/how-is-the-
  wppsi-scored/ ................................................................................. 13

Wechsler, David
  WPSSI™-IV Technical and Interpretive Manual
  Supplement: Special Group Validity Studies With Other
  Measures (4th ed. 2012) ................................................................. 13

**Introduction**

This case is a clear example of a school district overexerting its power to force parents to acquiesce to inappropriate and unnecessary testing for their child to gain access to federally mandated services. Aledo Independent School District ("AISD") has taken a hard stance that it be permitted to submit Annie, a child with Down syndrome who was three years old at the time this dispute began (now five), to IQ testing as part of evaluating her for special education services, and as a prerequisite to enrolling in such services. Annie's parents raised legitimate concerns—concerns with which AISD's own diagnostician agreed—that IQ testing was not appropriate for such a young child with Down syndrome, and noted that there were other, more appropriate means of testing for the same areas of disability. Given the long history of IQ testing being wielded for discriminatory purposes, and federal special education law's requirement that children with disabilities be educated in the least restrictive environment possible, Annie's parents had concerns that IQ testing would effectively pigeonhole Annie and be used to restrict her participation in a typical education setting with her neurotypical peers.

Annie's parents thus consented to the initial evaluation with the exception of the two IQ tests.

But Aledo did not budge. It stuck to its all-or-nothing offer: The school would not evaluate Annie without the option to use the IQ tests, and Annie could not receive special education services without such an evaluation. When Annie's parents challenged that unreasonable approach, a hearing officer for the Texas Education Agency and the district court rubber stamped it. This Court should not do the same.

IQ testing is unnecessary to properly evaluate Annie under the Individuals with Disabilities Education Act, 34 C.F.R. § 300.300 *et seq.* ("IDEA"). But AISD refused to move forward with evaluating Annie unless her parents consented to two specific IQ tests within the area of cognitive testing (when they had agreed to other types). As a result, Annie has not been served by the school district for over two years now and has been deprived of legally guaranteed services. AISD has no basis for its decision because nothing in the text of the IDEA makes consent an all-or-nothing proposition—indeed, the typical tools of statutory interpretation indicate that partial consent is valid consent under the statute. The hearing officer's determination that Annie's parents' partial

2

consent operated as a withholding of consent, and the district court's holding adopting that rule of law, was reversible error.

In passing the IDEA, Congress recognized that "[d]isability is a natural part of the human experience." 20 U.S.C. § 1400(c)(1). In stark contrast, the district court here found that "[r]aising a child with [Down Syndrome] is unquestionably a tremendous burden." ROA.471 (quotation marks omitted) (alteration in original). But the "burden" placed on Annie's parents is not their child. It is a school district that has required them to submit to an all-or-nothing, take-it-or-leave-it offer if they wish to access the services to which their child is entitled.

In addition to the IDEA, Annie has been discriminated against under the Americans with Disabilities Act (the "ADA") because AISD did not offer reasonable accommodations for Annie in evaluating her. Annie's parents explained to the school that her disability rendered IQ testing inappropriate and requested a reasonable accommodation: using other more effective and more appropriate methods of cognitive testing. AISD's refusal violates the ADA. But the district court never evaluated this theory, instead concluding that because (in the court's eyes) the school district had complied with IDEA, it could not have violated the ADA.

3

That is contrary to unequivocal instructions in the IDEA and recent Supreme Court precedent that "[n]othing in [the IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available under [the ADA]," 20 U.S.C. § 1415(*l*), and that the IDEA cannot be "effectively read … to implicitly limit" disabled children's ADA rights and remedies, *A.J.T. ex rel. A.T. v. Osseo Area Schs., Indep. Sch. Dist. No. 279*, 605 U.S. 335, 348 (2025).

The district court and the hearing officer got this case wrong. There is no legal requirement to IQ test Annie, and there is no basis to supersede her parents' wishes to move forward with an evaluation using other cognitive testing that both parties agreed was appropriate. Instead, this case is one of many in a troubled history of disability-rights violations at AISD, which was recently investigated by the Texas Education Agency ("TEA") and found to be in violation of numerous federal laws, including by improperly restricting the amount of time students with Down syndrome spend in general education classroom settings.[1] This Court should rule for Annie and her parents and remand

---

[1] Silas Allen, *Aledo ISD violated special education laws, state investigation finds*, Fort Worth Star-Telegram (Sept. 4, 2025),

to the district court to order AISD to move forward with evaluating Annie using the cognitive testing measures to which Plaintiffs have consented.

## Jurisdiction

The district court had jurisdiction under 20 U.S.C. § 1415(i)(2) (IDEA), 42 U.S.C. § 12133 (ADA), 29 U.S.C. § 794 (Rehabilitation Act), and 28 U.S.C. § 1331 (federal question jurisdiction). It entered a final judgment granting summary judgment to AISD on all claims on June 12, 2025. ROA.474. Plaintiffs timely appealed on July 11, 2025. ROA.475-76. This Court has jurisdiction under 28 U.S.C. § 1291.

## Statement of the Issues

**I.** Whether the district court erred in denying Plaintiffs' IDEA claim on the premise that a parent's partial consent for an initial evaluation operates as a full denial of consent.

**II.** Whether the district court erred in denying Plaintiffs' ADA claim by treating the requirements of the ADA as coextensive with the requirements of the IDEA and requiring proof of intent to discriminate.

---

https://www.star-telegram.com/news/local/fort-worth/crossroads/article 311885126.html.

## Statement of the Case

### A. The federal framework for education of individuals with disabilities

#### 1. IDEA

The IDEA is a federal law that ensures children with disabilities receive a free appropriate public education ("FAPE") tailored to their individual needs. The IDEA governs how states and public agencies provide early intervention, special education, and related services to more than eight million eligible infants, toddlers, children, and youth with disabilities.[2] IDEA was reauthorized by Congress in 2004 and most recently amended in December 2015 through Public Law 114-95, the "Every Student Succeeds Act." The law states:

> Disability is a natural part of the human experience and in no way diminishes the right of individuals to participate in or contribute to society. Improving educational results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities.

20 U.S.C. § 1400(c)(1).

---

[2] U.S. Dep't of Educ., *About IDEA*, https://sites.ed.gov/idea/about-idea/ (data as of as of the 2022-23 school year).

Before services are provided to a child with a disability under the IDEA, each public agency must conduct a full individual initial evaluation. 34 C.F.R. § 300.301(a). Under IDEA's implementing regulations, the evaluation must use a "variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child." *Id.* § 300.304(b)(1). The evaluation is to be conducted "in all areas of the suspected disability." *Id.* § 300.304(c)(4); *see also* 20 U.S.C. § 1414(b)(3)(B). The assessments and other evaluation materials must be "provided and administered in the child's native language or other mode of communication and in the form most likely to yield accurate information on what the child knows and can do academically, developmentally, and functionally, unless it is clearly not feasible to so provide or administer." 34 C.F.R. § 300.304(c)(1)(ii). And, prior to conducting the initial evaluation, the public agency proposing it must "obtain the informed consent from the parent." 34 C.F.R. § 300.300(a).[3]

---

[3] If the parent of a student with a disability refuses to consent to an evaluation, the school district may seek an order from a hearing officer overriding the parent's refusal. 34 C.F.R. § 300.300(c)(1)(ii). To meet its burden on this issue, the school district must document its attempts to

A further hallmark of the IDEA is meaningful parental involvement. The statutory design promotes communication and collective decision-making among schools and families to reach the best outcome for students and families seeking and receiving services under the IDEA. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005) ("Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians *a large measure of participation at every stage of the administrative process*, ... as it did upon the measurement of the resulting IEP against a substantive standard." (emphasis added) (quoting *Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley ex rel. Rowley*, 458 U.S. 176, 205-06 (1982))). Additionally, once a student is approved to receive services, federal law, including the IDEA, requires school systems to educate preschool children with disabilities in their least restrictive environment with access to nondisabled peers to the maximum extent appropriate. 34 C.F.R. § 300.114(a)(2)(i) ("Each public agency must ensure that [t]o the

---

obtain consent and articulate reasonable grounds for the evaluation sought. *Id.* § 300.300(d)(5).

maximum extent appropriate, children with disabilities ... are educated with children who are nondisabled.").

Practically speaking, from birth until the age of three, federally guaranteed IDEA services are operated through a federally funded and mandated governmental unit known as "Early Intervention."[4] Upon graduating from Early Intervention, three-year-old children with special needs are referred to the local school district to continue receiving these vital services for their growth and development.

### 2. ADA

The Americans with Disabilities Act ("ADA") protects people with disabilities from discrimination. In establishing the ADA, Congress found that "physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination." 42 U.S.C. § 12101(a)(1). More, "historically, society has tended to isolate and segregate individuals with disabilities," and

---

[4] First Five Years Fund, *IDEA Early Intervention and Preschool Programs* (July 29, 2019), https://www.ffyf.org/resources/2019/07/idea-early-intervention-and-preschool-programs/.

such discrimination has persisted in areas including "education" and "access to public services." *Id.* § 12101(a)(2), (3).

ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* § 12132.

The ADA defines discrimination to include: (1) the use of criteria that unnecessarily "screen out" or "tend to screen out" individuals with disabilities from the use and enjoyment of goods and services, (2) the failure to make nonfundamental, reasonable modifications of "policies, practices, or procedures" when such modification is necessary to accommodate disabled persons, and (3) the failure to take necessary steps

10

"to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals." *Id.* § 12182(b)(2) (defining "discrimination" under the ADA); *see also* 34 C.F.R. §§ 104.43-104.44 (implementing Section 504), 28 C.F.R. § 36.103 (stating that the ADA "shall not be construed to apply a lesser standard than the standards applied" under the related Section 504 of the Rehabilitation Act).

Moreover, "the ADA and Section 504 [of the Rehabilitation Act] specifically prohibit discrimination against the handicapped, not just based on invidious 'affirmative animus,' but also based on thoughtlessness, apathy and stereotypes about disabled persons." *Guckenberger v. Bos. Univ.*, 974 F. Supp. 106, 134 (D. Mass. 1997); *see Alexander v. Choate*, 469 U.S. 287, 295-97 (1985).

### B.    IQ testing methods

This case involves the insistence of a school district on being allowed to use two specific IQ tests on a disabled student to evaluate her for special education services. Those two tests are the Woodcock-Johnson IV Tests of Early Cognitive and Academic Development ("Woodcock-

Johnson" or "ECAD") and the Wechsler Preschool and Primary Scale of Intelligence ("WPPSI," pronounced "Wippsy").

***The Woodcock Johnson ECAD.*** The ECAD is adapted from the Woodcock-Johnson IV tests, and all Woodcock-Johnson IV tests share a common interpretive model and utilize the same scoring metric.[5] The ECAD involves ten tests which measure general intellectual ability, early academic skills, and expressive language skills.[6] The ECAD is approved for use by children as young as 2 and a half.[7] However, the test was normed based on the chronological, rather than developmental, age of 2, meaning that, for example, a 6-year-old with Down syndrome taking the

---

[5] *Early Childhood Assessment: Utility of the WJ IV ECAD®,* Riverside Insights (Dec. 2, 2021), https://blog.riversideinsights.com/early-child hood-assessment-wjiv-ecad ("Grant Blog"); Erica M. LaForte et al., Assessment Service Bulletin Number 4: Woodcock-Johnson® IV Tests of Early Cognitive and Academic Development: Overview and Technical Abstract (2015), *available at* https://pages.nelson.com/assessment/pdf/ asb4.pdf.

[6] Grant Blog, *supra* note 5.

[7] F.A. Schrank & B.J. Wendling, *Abstract*, The Woodcock-Johnson IV Tests of Early Cognitive and Academic Development, *in* Contemporary Intellectual Assessment: Theories, Tests, and Issues 283 (D.P. Flanagan & E.M. McDonough eds., 4th ed. 2018), *available at* https://psycnet. apa.org/record/2018-36604-010.

test would be compared to neurotypical 6-year-olds. *See* ROA.1437 (Tr. 75:23-76:1), ROA.1507 (Tr. 145:23-25).

***The WPPSI.*** The WPPSI is used to determine a child's verbal and performance IQ scores and processing speed. The WPPSI includes five primary index scores including verbal comprehension index, visual spatial index, fluid reasoning index, working memory index, and processing speed index.[8] Prior to establishing the final test framework, the WPPSI was tested through several experimental editions. As part of the standardization process, exclusionary criteria for the normative sample were developed. These criteria specifically excluded children that had previously experienced a period of unconsciousness greater than 20 minutes related to medical condition.[9]

Neither of these specific tests is found anywhere in the statutory or regulatory provisions implementing the IDEA (or ADA). They are tools

---

[8] *WPPSI Scores | Understand Your Child's WPPSI Test Scores* (2025), https://www.testingmom.com/tests/wppsi-test/how-is-the-wppsi-scored/.

[9] David Wechsler, WPSSI™-IV Technical and Interpretive Manual Supplement: Special Group Validity Studies With Other Measures (4th ed. 2012), *available at* https://www.pearsonassessments.com/content/dam/school/global/clinical/us/assets/wppsi-iv/wppsi-iv-technical-manual-supplement.pdf?srsltid=AfmBOopE0zS0W0PRI6NNC0zm3Loc6xtvQbgeoN80hxRQOTVq5YfpmsH5.

13

that schools have used in certain instances, but typically in conversation with parents. AISD has not identified any instance—other than this one—where the refusal to consent to these IQ tests resulted in a wholesale denial of evaluation and thus services.

### C. Annie's story

#### 1. Annie's immense initial challenges

Annie is a now-five-year-old child with Down syndrome who resides with her parents, Courtney and Spencer, in Parker County, Texas.

Annie has a diagnosis of Down syndrome (otherwise known as Trisomy 21). She also has a concurrent congenital heart defect which required her to undergo a complicated open-heart surgery at four months old. During that procedure, Annie suffered a cardiac arrest and almost lost her life. She was unconscious and without oxygen for 52 minutes and then spent 10 days on the highest form of life support (an extracorporeal membrane oxygenation machine). Mercifully, Annie survived and has worked exceedingly hard since then to meet the developmental milestones that parents of all toddlers and young children hope they will achieve. While Annie's parents were told she might never talk or walk, she has done both of those things and more, all with the help of dedicated

14

professionals in the areas of speech therapy, physical therapy, and occupational therapy.

Annie's family residence is zoned for the Aledo Independent School District, which operates the local public schools in Parker and Tarrant counties. AISD is a large and growing school district in Northern Texas, including 12 separate campuses and covering 130 square miles, including all or part of the communities of Aledo, Annetta, Annetta North, Annetta South, Cresson, Fort Worth, Hudson Oaks, Weatherford and Willow Park.[10] AISD's mission, as set forth on its website, is "[e]nsuring high levels of learning for all students."[11]

As a public school system, AISD is federally mandated to have a special education program and to offer children with special needs both in-school services (when a child attends the regular school day) and walk-in services (like speech therapy, physical therapy and/or occupational therapy offered outside of regular school hours to children who do not attend the public school). AISD's "Special Programs" claims to

---

[10] *About Aledo ISD* (2025), https://www.aledoisd.org/about-aledo-isd/about-aledo-isd.

[11] *Id.*

15

"continuously improve, foster accountability, and engage in student-focused collaborative teams, so students of all abilities achieve greatness."[12]

Children like Annie are candidates for both in-school and walk-in services at AISD. In order to access these services, children with a suspected disability must be evaluated under the IDEA framework set forth above. These types of services are not only crucial for Annie's development, but, as explained above, she is also entitled to them under federal law.

### 2.    Seeking services through AISD

In order to ensure continuity of Annie's services, which she had been receiving via Early Intervention with providers outside of AISD, Annie's mother contacted AISD shortly after Annie's third birthday to enroll her in services through the school district.

Annie's mother first contacted AISD on September 20, 2023. ROA.1077. Just over a week later, Annie's mother had a telephone conversation with the diagnostician at AISD, Jennifer Williams. During

---

[12] *Aledo ISD Special Programs Family Resources*, https://sites.google.com/aledoisd.org/parent-resources/home.

16

that call, Courtney raised concerns about what type of cognitive testing

AISD intended to use with Annie. Specifically, Courtney stated:

> I know I alluded to this in our first phone call, but … my fear
> is Annie being labeled … that's why I was asking questions
> about cognitive testing because I don't … want her, I guess,
> put in a box before we really know Annie.

ROA.135.

Ms. Williams made several statements to Annie's mother that

reflected an intention to evaluate Annie without using IQ testing:

- [W]e do what's called *transitional disciplinary play-based assessment, which means we all have checklists that kind of categorize the kids by ages … ."*

- Because *it's really hard with little bitties*, especially with language, any kind of language component, *to get formal testing.* And so, *play-based is better for them* than sitting at a table and going hey, point. Point to this.

- However, *usually for three-year-olds, I cannot even give the ECAD or the WPPSI* because it's lots of following my oral directions and doing tasks, and that's usually too much.

- So, *I can take my checklist and the play-based and put it in something called the [PH] DAC4* [sic], which gives—it's a checklist and it's still just a running checklist. I can show you one when we meet. Of things they can do like stacking blocks. Can they match small, medium, large? Can they say their name? Do they know if they're a boy or a girl? … *And based on that I can get a cognitive score.*

ROA.133-34; *see also* ROA.1537 (Tr. 175:8-10) ("Q. [directed to Ms.

Williams]: Okay. And then did you have a phone call with the parent on

17

September 29th? A: Yes."). Based on this conversation with Ms. Williams, Annie's parents understood that IQ testing would not be appropriate for Annie and AISD would not use such testing in the evaluation. Instead, they understood that the Developmental Assessment of Young Children, 2d Edition (DAYC-2), a different type of cognitive testing that does not involve a full-scale IQ score, would be appropriate and would be used. The "DAYC-2" tests five domains, including cognition, communication, social-emotional development, physical development, and adaptive behavior. Judith K. Voress et al., Developmental Assessment of Young Children (2d ed. 2012).[13]

### 3.   The notice of evaluation

On October 9, 2023, Annie's parents received a Notice of Evaluation from Ms. Williams that included the ECAD and WPPSI assessments (i.e., the IQ tests) in a list of "tests which may be used" in evaluating Annie. *See* ROA.1160-61 On October 31, 2023, Annie's mother spoke on phone with Ms. Williams and expressed her frustration that the assessments

---

[13] *Available at* https://www.pearsonassessments.com/store/usassess ments/en/Store/Professional-Assessments/Developmental-Early-Child hood/Developmental-Assessment-of-Young-Children-%7C-Second-Edition/p/100000730.html?tab=product-details.

that Ms. Williams had agreed would not be used on Annie were listed in the consent form. ROA.141-43; ROA.1611.

Three days later, on November 3, Annie's mother returned a completed consent form to Ms. Williams via email, but with the two formal IQ tests crossed off. *See* ROA.1222-23. Importantly, Annie's mother stated that she and Annie's father consented to the rest of the tests and assessments listed on the form, which included consent to administer cognitive, intellectual, and adaptive behavior assessments using *other* tools, including Parent and Teacher Interviews/Rating Scales, Transdisciplinary Play-Based Assessment, DAYC-2, and Developmental Profile 4 (DP-4). *See* ROA.1611. Indeed, these were the assessments that, only a couple of weeks prior to receiving the Notice of Evaluation, Annie's mother and Ms. Williams had *collaboratively* agreed were appropriate for Annie and reflected multiple different potential tools for assessing Annie's cognitive abilities.

On November 6, 2023, Annie's sent another email to Ms. Williams, expressing concern regarding how long it was taking to get Annie services. She received no response for ten days. On November 17, 2023, AISD's Assistant Superintendent emailed Annie's parents a "Notice of

Decision Prior [sic] Written Notice" (the "Notice of Decision"), stating that "Parent has provided a restricted consent form that does not meet the legal requirements of federal and state law, and the District cannot proceed with the evaluation without full consent. Parent has effectively declined to consent for cognitive and achievement testing." *See* ROA.618.

But Annie's parents had *not* declined consent to the initial evaluation, including cognitive and achievement testing. They had agreed with Ms. Williams that other cognitive testing tools, such as the DAYC-2 and parent checklist were appropriate means for evaluating Annie's cognitive abilities. They then consented to those tests and other forms of assessment, with the limited restriction that they did not want Annie subjected to IQ testing. Annie's parents were willing then, and remain willing now, to allow AISD to conduct cognitive and adaptive assessments as long as the formal IQ tests that they specifically object to are not administered. But to this day, AISD has not conducted an evaluation on Annie, and no one from AISD has even ever met Annie.

### D. Procedural history

#### 1. Due process complaint and resolution session

Following receipt of the Notice of Decision, Annie's parents remained steadfast in their commitment that IQ testing was not

appropriate for their daughter, and so would not accede to AISD's demands that they fully consent to Annie's assessment, without any restrictions on assessment tools. So they filed a petition for what is known as a "due process hearing" with the TEA—a form of administrative challenge of Aledo's decision.

As part of the due process hearing process, the parties were required to participate in a resolution session (without counsel) or mediation (with counsel present) by December 13, 2023. *See* ROA.540. Annie's parents requested mediation, but AISD insisted on a resolution session without counsel present. Annie's parents recorded the session.[14] *See* ROA.146-54. During the session, Annie's parents once again made clear what assessments they would accept and what they would not, consistent with the Notice of Evaluation they marked up and returned to AISD in October:

> So the form that we have signed has marked down IQ testing that [sic] we consent to everything else. But when it comes to an IQ test, that is not a valid or appropriate test for Annie. That's where we're at.

---

[14] Texas only requires the consent of one party to record a conversation. *See* Tex. Penal Code § 16.02(c)(4).

ROA.147. AISD made very clear that Annie's parents must either sign an unlimited consent to allow AISD to do whatever tests it wanted or AISD would do no assessments:

> We just can't accept limited consent. *We need full consent to do a full and individual evaluation …* . We can't start any special ed services until you sign that consent as well.

*See* ROA.147-48 (emphasis added).

Because Annie's parents were unable to offer their unconditional consent and Aledo would not agree to test Annie with the minor no-IQ-testing restriction, the parties were unable to reach an agreement during the resolution session. *See* ROA.154. Annie's parents thus sought to administratively challenge AISD's decision through a due process hearing. For its part, Aledo sought an order overriding Annie's parents' wishes that would allow it to test Annie as it saw fit. *See* ROA.586; *see also* 34 C.F.R. § 300.300(a)(3) (permitting school districts to use the due process procedures to override lack of parental consent to an initial evaluation).

### 2.    Due process hearing and decision

Ultimately, a due process hearing (the "Hearing") was held on February 8, 2024, five months after Annie's parents had reached out to AISD to begin the process of enrolling Annie in services there. At the

Hearing, Dr. Pamela Peak, an expert in the assessment of students with learning differences, testified that the DAYC-2 and DP-4 assessments provide the necessary quantitative measures to determine the proper services for Annie, and that assessing Annie using the tools listed on the second Notice of Evaluation (crossing off the ECAD and WPPSI tests, as Annie's parents did) would allow AISD to accomplish what is required by the IDEA to evaluate Annie. *See* ROA.1435-36 (Tr. 73:13-74:15). Dr. Peak also testified that input from teachers and parents and using an interview coupled with play-based testing would be "the better way to go," and that it would provide more valid, reliable results than IQ testing. ROA.1436 (Tr. 74:9-15).

The TEA hearing officer issued a decision on March 19, 2024, in favor of AISD. ROA.30-54. The Hearing Office Decision reasoned that AISD's "evaluators must be permitted to exercise their professional judgment in determining which assessments are appropriate for obtaining a complete picture of [Annie's] strengths and challenges." ROA.52-53. And it concluded that Annie's parents' "attempt to limit the evaluation by refusing to consent to the WPPSI-IV [WPPSI] and the ECAD-IV [ECAD] (or any other measure that would provide a full-scale

IQ score) amounts to a lack of parental consent, and reasonable grounds override Parents' lack of consent." ROA.53. The Hearing Officer Decision thus rejected Annie's parents' position and granted AISD's request for an order overriding lack of parental consent. Despite this order, AISD has not scheduled or conducted Annie's evaluation to date.

### 3.    The federal lawsuit

Following entry of the Hearing Officer Decision, Plaintiffs (Annie and her parents) initiated this federal action on June 17, 2024. They brought claims under the IDEA, the ADA, and the Rehabilitation Act.

After the parties cross-moved for summary judgment on the administrative record, the district court ruled for AISD ("Opinion"). In that Opinion, the court "affirm[ed] the hearing officer's decision in full"— rejecting Plaintiffs claims under the IDEA, ADA, and Rehabilitation Act and affirming the ruling overriding Annie's parents' consent restrictions. ROA.468.[15]

---

[15] If this Court agrees with Appellants that AISD's failure to accept Annie's parents partial consent violated federal law, then the order permitting Aledo to evaluate Annie as it sees fit (including through the use of IQ testing), necessarily fails too. But Appellants do not challenge that ruling separately from its appeal of the Court's denial of its affirmative claims.

With respect to the IDEA, the district court held that "this case is an excellent example of what is legally required by the school district and the parents [sic] right to consent or refuse consent, but not dictate or limit areas in which the district can evaluate for a suspected disability." ROA.467. It concluded that (1) Annie's parents "exercised their right not to consent to cognitive and achievement testing to be completed by AISD," (2) that "no evidence [was] presented by [Annie's parents] at the due[] process hearing to support the claim that cognitive measures such as the WPPSI or ECAD are inappropriate for a child of A.M.'s age," and (3) that to permit Annie's parents "to pick and choose specific testing measures would hinder AISD's legal obligations to evaluate all areas of suspected disability under IDEA." ROA.468-69.

With respect to the ADA claim, the court held AISD did not "violat[e] the ADA by discriminating against A.M. because of its compliance with IDEA." ROA.470. It further explained that because Annie "has not yet been evaluated by AISD to determine the presence of a disability," she "has not been determined to meet the definition of an individual with a disability for purposes of the ADA." ROA.470. And the court determined that even if Annie had shown she was discriminated

against on the basis of a qualifying disability, the ADA claim would still fail because it concluded that Plaintiffs had not offered sufficient proof of "*intentional* discrimination." ROA.471 (emphasis added).

## Summary of Argument

**I.** The district court erred by granting summary judgment to AISD on Plaintiffs' IDEA claim.

**A.** The district court wrongly found that partial consent to an initial evaluation operates as refusal. It concluded that "AISD has an obligation under IDEA to assess a student in all areas relating to the suspected disability, and A.M.'s parents correspondingly *exercised their right not to consent* to cognitive and achievement testing to be completed by AISD." ROA.468-69 (emphasis added). The district court's holding that partial consent operates as a refusal is antithetical to the statutory language and the sparse case law on this issue.

**1.** The statutory text requires a parent give "informed consent" to an initial evaluation, 34 C.F.R. § 300.300(a)(1)(i), and provides a detailed definition of what makes "consent" "informed," 34 C.F.R. § 300.9. But nothing in the text suggests that a parent cannot limit the consent they provide in any way. To the contrary, that the definition of "consent"

specifies that parents must consent to "*the activity* for which his or her consent is sought," 34 C.F.R. § 300.9(b) (emphasis added), suggests that consent can be appropriately tailored and narrowed.

**2.** Though precedent is somewhat limited on this issue because AISD's unwillingness to work with Annie's parents is unprecedented, caselaw supports the proposition that partial consent can be valid under the IDEA. Notably, the district court's holding otherwise did not identify a single case rejecting the concept of partial consent.

**3.** The IDEA's statutory commitment to parental involvement further supports allowing partial consent. At every turn, the statute encourages parents to be active participants in the process. But AISD would read the first step of that process—the initial evaluation—to require parents to unconditionally consent to the school's choice of testing, or else risk their child losing access to services altogether. Relatedly, the statute requires school districts to "make reasonable efforts to obtain" parental consent under 34 C.F.R. § 300.300(a)(1)(iii). A take-it-or-leave-it testing proposal is far from a reasonable effort to obtain consent.

27

**B.** Partial consent is thus valid in some circumstances. True, a parent's restrictions on their consent may be so extreme in some cases that they operate as an effective denial of consent. But the statute provides a limiting principle: School districts must evaluate students in "all areas of suspected disability." 20 U.S.C. § 1414(b)(3)(B). If a parent's limits on consent interfered with that duty, partial consent may well operate as a denial of consent. But this is nowhere near such a case. Annie's parents consented to cognitive and achievement testing, just not two IQ tests that were proposed by AISD. Their broader consent to cognitive testing generally, including specific alternate cognitive tests discussed and agreed to with AISD's diagnostician, amounts to consent to cognitive testing. Annie's parents consented to an initial evaluation, and AISD violated the IDEA by refusing to evaluate Annie in accordance with that consent.

**II.** The district court also erred by granting summary judgment to Aledo on Plaintiffs' ADA claim.

**A.** The district court wrongly conflated the standards under the IDEA and ADA and based its rejection of the ADA claim on its (flawed) IDEA reasoning. It concluded that Annie was not a "'qualified individual

28

with a disability' for purposes of the ADA" because she "has not yet been evaluated *by AISD*" to determine whether she qualifies for services under the IDEA. ROA.470 (emphasis added). But Annie's entitlement to ADA protections does not turn on her entitlement to IDEA services. The court further held that AISD did not "violat[e] the ADA by discriminating against A.M. because of its compliance with IDEA." ROA.470. This is squarely contrary to the IDEA statute, which provides "[n]othing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under … the Americans with Disabilities Act." 20 U.S.C. § 1415(*l*); *see also A.J.T.*, 605 U.S. at 348 (holding that "effectively read[ing] the IDEA to implicitly limit the ability of children with disability to vindicate their independent ADA and Rehabilitation Act rights," "is irreconcilable with the unambiguous directive of § 1415(*l*)"). The district court's ADA reasoning was derivative of its IDEA holding, and thus improperly failed to analyze Annie's "independent ADA … rights." *A.J.T.*, 605 U.S. at 348. This is reversible error.

**B.** The district court's alternative reasoning for rejecting the ADA claim is similarly flawed. It held that "Plaintiffs' ADA claim fails because the administrative record before the Court is completely devoid of

29

intentional discrimination." ROA.471. Even if that were true (which it is not), it would justify rejection of only Plaintiffs' claims for compensatory damages—ADA plaintiffs need not show intentional discrimination to obtain injunctive relief. *See A.J.T.*, 605 U.S. at 344. Plaintiffs seek both injunctive and compensatory relief, so this reasoning is insufficient to uphold judgment to AISD on Plaintiffs' entire ADA claim.

**C.** Viewed under the proper standard, Plaintiffs are entitled to summary judgment on the ADA claim. Namely, the administrative record shows that all three elements of a failure-to-accommodate claim are met. First, Annie's Down syndrome diagnosis is undoubtedly a qualifying disability. Second, the school district had knowledge of that disability because Annie's parents painstakingly explained to the district her diagnosis, why it rendered IQ testing improper, and what it desired in terms of an accommodation. Third, that accommodation request was reasonable—it put little to no burden on the district, and alternative methods of testing exist. No more is needed to grant summary judgment on Plaintiffs' ADA claim for injunctive relief. Plaintiffs are also entitled to judgment for compensatory damages, however, because the record shows Aledo acted intentionally.

## Argument

**I.    The district court erred in concluding that IDEA does not permit partial parental consent to an initial evaluation and that Annie's parents thus did not provide consent.**

Under the IDEA, schools must generally obtain parents' "informed consent" for an "initial evaluation" of a student with a suspected disability to determine their eligibility for special education services and take the first step towards developing an individualized educational program ("IEP"). But parents are not required to provide full consent to all testing proposed as part of an initial evaluation—partial consent can operate as informed consent where it would still allow the school to test in all areas of suspected disability. Nothing in the text of the statute says otherwise. Rather, the IDEA encourages parents to be meaningfully involved in their child's education, including the cooperative process that the IDEA establishes between parents and schools. *See Schaffer*, 546 U.S. at 52-54. The district court's holding that partial consent operates as a refusal of consent improperly evades this cooperative process, inventing the requirements that parents must provide "all or nothing" consent to an initial evaluation in order to receive services to which students are entitled under the IDEA. Because Annie's parents in fact *did consent* to the district evaluating in all suspected areas of disability during the

initial evaluation, only disagreeing with specific cognitive testing, the informed consent requirement was met, and AISD should have proceeded with testing (excluding the two IQ tests in question). The district court's rejection of partial consent—no matter how limited the restrictions on consent are—finds no basis in law and cannot stand.

## A. The district court erred in concluding that IDEA does not permit partial consent to an initial evaluation.

The decisions below are founded on a faulty legal premise: that partial consent operates as a refusal of consent under the IDEA. The IDEA says nothing of the sort, and the law compels a contrary reading.

To start, the hearing officer concluded, with minimal reasoning and citation to only one out-of-circuit district court opinion, that the IDEA does not permit partial consent. The hearing officer's decision states:

> The *IDEA does not authorize parents to provide partial or incomplete consent to an initial evaluation*, and when parents attempt to narrow an evaluation by refusing certain testing, partial consent operates as a refusal.

ROA.50-51 (emphasis added).

The district court adopted this understanding as well, this time with almost no reasoning or a single citation. It held that "AISD has an obligation under IDEA to assess a student in all areas relating to the suspected disability, and [Annie's] parents correspondingly exercised

32

their right not to consent to cognitive and achievement testing to be completed by AISD." ROA.468-69; *see also* ROA.467 ("The Court concludes that this case is an excellent example of what is legally required by the school district and the parents right to consent or refuse consent, but not dictate or limit areas in which the district can evaluate for a suspected disability.").

But partial consent *is* consent, so the underlying premise of both the hearing officer's and district court's decisions is wrong. If Plaintiffs' partial consent to the initial evaluation is deemed "informed consent" under the IDEA—as it should be—the reasoning of the decisions below crumbles.

> **1.   The text of the IDEA regulations supports not confining "consent" to "full consent."**

"[S]tart[ing] with the text," *Vanderlan v. United States*, 135 F.4th 257, 269 (5th Cir. 2025) (quotation marks omitted), the regulatory definition of "consent" in 34 C.F.R. § 300.9 does not provide an all-or-nothing proposition. *See also* 34 C.F.R. § 300.300(a)(1)(i) ("The public agency proposing to conduct an initial evaluation to determine if a child qualifies as a child with a disability under § 300.8 must … obtain

informed consent, consistent with § 300.9, from the parent of the child before conducting the evaluation."). The regulation defines "consent" as:

(a) The parent has been fully informed of all information relevant to the activity for which consent is sought, in his or her native language, or through another mode of communication;

(b) The parent *understands and agrees in writing to the carrying out of the activity for which his or her consent is sought, and the consent describes that activity and lists the records (if any) that will be released and to whom*; and

(c)

(1) The parent understands that the granting of consent is voluntary on the part of the parent and may be revoked at any time.

(2) If a parent revokes consent, that revocation is not retroactive (i.e., it does not negate an action that has occurred after the consent was given and before the consent was revoked).

(3) If the parent revokes consent in writing for their child's receipt of special education services after the child is initially provided special education and related services, the public agency is not required to amend the child's education records to remove any references to the child's receipt of special education and related services because of the revocation of consent.

34 C.F.R. § 300.9 (emphasis added).

That text plainly does not distinguish between partial or full consent or make consent contingent upon full, unconditional consent.

34

Indeed, the language indicates that consent is provided for a specific "activity," which implies that consent can and should be understood as limited to those activities for which consent is provided. Thus, a parent can provide "informed consent" to an initial evaluation under the text of 34 C.F.R. § 300.300(a)(1)(i) by doing exactly what Annie's parents did here—consenting to evaluation in all suspected areas of disability but reasonably restricting their consent as to certain tests.[16]

### 2. Case law supports a non-restrictive approach to consent under the IDEA.

Caselaw supports the understanding that partial consent is accepted under the IDEA. For example, in *A.H. ex rel. A.H. v. Clarksville-Montgomery Cnty. Sch. Sys.*, 2019 WL 483311 (M.D. Tenn. Feb. 7, 2019),

---

[16] Moreover, other statutes and regulations that use the term "consent" adopt a definition that includes partial consent. For example, while in the context of medical consent, HIPAA provides for partial consent by virtue of providing that a medical records release form should contain "[a] description of the information to be used or disclosed that identifies the information in a specific and meaningful fashion." 45 C.F.R. § 164.508(c)(1)(i). By allowing for limited information to be disclosed, the statute sets up the opposite of an "all-or-nothing" approach. A HIPAA consent form is not rendered ineffective by partially consenting; indeed, it is designed to function with partial consent in describing the information to be disclosed. There is no reason to treat the evaluation form in this case differently—crossing out the tests that are being considered for use in the evaluation should function as partial consent, which is still consent.

the court found that A.H.'s parents had not refused to consent to services under the IDEA by failing to reach an agreement on one element of the plan—which classroom the student would be placed in under the IEP. The court found that the parents had "zealously pursued" services and that none of the defendants identified any basis for treating their decision as refusal to consent to services altogether. *Id.* at *7.

The *A.H.* court further held that:

> A.H.'s parents, though, did not refuse to consent to services or fail to respond; they just disagreed with a core aspect of the plan offered. *There is no basis in the text of the IDEA or its accompanying regulations for construing that disagreement as relieving the agencies of their responsibilities to ensure that A.H. received a FAPE.*[17]

*Id.* at *8 (emphasis added).

Moreover, the *A.H.* court recognized that:

> [c]onsent, the statute and regulations recognize, can occur at different levels of specificity. A parent may, for example, consent to the provision of special education and related services but oppose some component of the school's proposed methods. An educational agency is shielded from liability only

---

[17] The district court is mistaken that because Annie "has not yet been evaluated or found eligible for special education and related services under the IDEA, the FAPE analysis—including parental participation and determination of the least restrictive environment—is simply not applicable." ROA.468. There is no sensible limitation on meaningful participation, and indeed, if parents have the right to refuse consent, they are clearly legally vested with the right to participate (or not).

where "the parent … refuses to consent to the receipt of special education and related services, or the parent fails to respond to a request to provide such consent." 20 U.S.C. § 1414(a)(1)(D)(ii)(III). … Nothing in the IDEA shields an agency in a case where parents agree that their child is entitled to services but refuse to consent to the way in which the agency wishes to provide them.

*Id.* (emphasis omitted).

Courts at the state level have similarly evaluated consent under the IDEA, finding that a lack of consent may not be used to deny a child a FAPE. For example, the Virginia appellate court found that any failure by the mother of a child with a disability to consent to the initial eligibility determination regarding the child's disability for special education services did not negate the child's status as a child with a disability under the IDEA, explaining that "[s]imply put, a child's entitlement to special education and related services cannot be contingent on parental consent to the eligibility determination." *See J.V. ex rel. Veldhuyzen v. Stafford Cnty. Sch. Bd.*, 792 S.E.2d 286, 294-95 (Va. Ct. App. 2016).

In a case from the District Court of Appeal of Florida, First District, the student's mother signed a form consenting to comprehensive testing for M.H. and a full evaluation. *M.H. v. Nassau Cnty. Sch. Bd.,* 918 So.2d

316, 319 (Fla. Dist. Ct. App. 2005). However, M.H.'s mother later revoked consent for a portion of the evaluation, withholding consent to conduct emotional and behavioral evaluations of M.H. *Id.* at 319-20. M.H. underwent testing and the school board determined that it was unable to conclude whether M.H. qualified for exceptional student education under IDEA because the full evaluation had not been performed due to M.H.'s mother's lack of consent. The court ultimately found that M.H.'s mother had provided full consent for testing, but it also explained that "[i]t is also legally incorrect that M.H.'s rights under the IDEA were or could have been extinguished by his mother's failure immediately to accede to the School Board's every suggestion." *Id.* at 321. The court found that the school board had not done everything it could have done as it identified M.H. as having particular needs and recommended he be evaluated, but failed to provide information to M.H.'s mother, make a formal written referral for evaluation, or document any attempts to obtain parental consent. *Id.*

In the face of case law supporting the acceptance of partial consent, the district court did not cite any caselaw to support its all-or-nothing approach. The hearing officer cited only one case, which did not stand for

38

the proposition that full consent to each type of cognitive test proposed here was required. That case involved far more extensive limitations on parent consent than that at issue here:

> [T]he [parents'] addendum specifie[d] who shall conduct the evaluation; it require[d] that the parents approve each of the specific instruments to be used for the evaluation; it require[d] that the evaluator meet with the parents before and after the evaluation; it require[d] that the evaluator discuss the evaluation results with the parents before the results are submitted to the IEP team; and it require[d] that the evaluation be used only for the purposes of developing G.J.'s IEP. In addition, Plaintiffs added the condition that the testing must be done in [one parent]'s presence … [and] that the reevaluation not be used in litigation against [Plaintiffs].

*G.J. ex rel. E.J. v. Muscogee Cnty. Sch. Dist.*, 704 F. Supp. 2d 1299, 1309 (M.D. Ga. 2010) (quotation marks omitted), *aff'd sub nom. G.J. v. Muscogee Cnty. Sch. Dist.*, 668 F.3d 1258 (11th Cir. 2012). The court explained "[w]ith such restrictions, Plaintiffs' purported consent is not consent at all." *Id.* While the court noted that "such restrictions" operated to negate the purported consent, it did not suggest that just *any* restrictions would do so. *Contra* ROA.50-51 (hearing officer holding that "partial consent operates as a refusal"). It thus does not support the proposition that more limited restrictions—like those at issue here— would effectively be the denial of consent. *See infra* Section I.B

(explaining that sufficiently extreme restrictions on consent may, in some cases, operate as effectively denying consent).

While the weight of the caselaw supports Plaintiffs' position, it is also undisputable that there is limited precedent addressing this specific question. But that is because AISD's actions—which are an outlier and not part of anything like a state-wide policy—are largely unprecedented: School districts usually engage with parents and make reasonable adjustments to accommodate them.

### 3. Partial parental consent aligns with the IDEA's commitment to parental involvement.

Recognizing partial parent consent also squares with the structure of the IDEA. As the Supreme Court has explained, "[t]he core of the statute … is the cooperative process that it establishes between parents and schools." *Schaffer*, 546 U.S. at 53. This "core" is displayed throughout the statute, from the requirement at issue here that parents be "informed about and consent to evaluations of their child" to parents' "inclu[sion] as members of IEP teams." *Id.* (quotation marks omitted). Indeed, other courts of appeal have described "preventing full and effective parental participation," as "'driv[ing] a stake into the very heart of the Act.'" *Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 893

(9th Cir. 2001) (alteration in original) (quoting *Town of Burlington v. Dep't of Educ.,* 736 F.2d 773, 783 (1st Cir. 1984)).

In law and in fact, AISD's approach to parental consent violates this fundamental IDEA principle. When Annie's parents sought a role in the "cooperative process," *Schaffer,* 546 U.S. at 53, they were swiftly met with a cold shoulder. There was no cooperation, no parental participation. Either they could sign the form granting unconditional consent to Aledo's testing choices, or—as proven by the last two years—their daughter could go without AISD's special education services. That is not the system the IDEA calls for.

As a final note, that an agency must "make reasonable efforts to obtain" parental consent under 34 C.F.R. § 300.300(a)(1)(iii) suggests that consent should be at least in part a discussion. "Reasonable efforts" should include conversations with parents to understand their preferences and limits, and concessions where "reasonable." Indeed, the Ninth Circuit has considered "offering to make multiple concessions to appease [a parent's] demands" as evidence of making "'reasonable efforts'" to obtain consent. *J.B. ex rel. L.B. v. Kyrene Elementary Sch. Dist.*

41

*No. 28*, 112 F.4th 1156, 1162 (9th Cir. 2024) (quoting 34 C.F.R. § 300.300(d)(5)).

By "inhibit[ing] meaningful parental involvement," AISD has thus "contravened the letter and the spirit of the statute." *Briere ex rel. Brown v. Fair Haven Grade Sch. Dist.*, 948 F. Supp. 1242, 1254 (D. Vt. 1996).

### B. Partial consent was granted with respect to cognitive testing only—full consent was given to evaluating in all suspected areas of disability.

As established above, the IDEA does not create a system of all-or-nothing consent where a parent is forced to either agree to the precise contours of an initial evaluation that the school district wishes, or risk leaving their child without services all together. But Plaintiffs recognize that in *some* cases a parents' limitations on consent may operate as an effective denial. This is simply not such a case. Instead, Plaintiffs do not dispute that AISD was required to evaluate Annie in "all areas of suspected disability" under the IDEA. 20 U.S.C. § 1414(b)(3)(B). If consent was limited so that there was no way to evaluate an area of suspected disability, that may well be an effective denial. But the very limited restrictions here did no such thing.

Nevertheless, the district court found: "AISD has an obligation under IDEA to assess a student in all areas relating to the suspected disability, and [Annie's] parents correspondingly exercised their right not to consent to cognitive and achievement testing to be completed by AISD." ROA.468-69. With respect to the first clause, as explained above, Plaintiffs have always agreed throughout this dispute that AISD is obligated to assess Annie in all areas of suspected disability, including cognitive assessment. Indeed, Plaintiffs' opposition brief to AISD's motion for summary judgment states clearly: "Annie's parents do not object to a cognitive assessment, generally. Their objection is limited to two specific tests enumerated in a battery of assessment tools, based on specific concerns that they have identified in good faith." ROA.365 (emphasis omitted). It appears that the district court ignored entirely that Annie's parents not only stated on the record that they did not object to cognitive testing generally (and in fact, consent to it), but also that they argued as much in briefing to the district court. *See also* ROA.366 ("Annie's parents *do not refuse all cognitive testing.* Thus, there is no dispute that the District should be allowed to evaluate Annie in all areas of suspected disability, as required by the IDEA."). The fact that the

43

district court's holding thus rests on a point that Plaintiffs did not even dispute exemplifies the error.

The record clearly demonstrates Annie's parents consented to all portions of the initial evaluation, with the exception of the ECAD and WPPSI. *See* ROA.366 ("we as a family are happy to sign a portion of the release essentially"; "We've agreed to the [DAYC-2]"; "we disagree with" the Wechsler and Woodcock Johnson being "on the table" (quotation marks omitted)); *see also* ROA.1222-23. The other methods of cognitive testing provide AISD ample ability to test Annie in "all areas of suspected disability." But "IQ" is not an area of disability.

To be clear, Plaintiffs understand AISD to agree that they were not legally *required* to use IQ testing—an admission that all areas of suspected disability have alternative assessment options. *See* ROA.334 ("Plaintiff is correct that there is no legal mandate that all initial evaluations include IQ testing … ."). If there was such a requirement, the limitation of consent as to that aspect may an effective denial of consent. But, again, the school district was not required to administer the IQ tests in question in order to evaluate Annie, and they have never made such an argument or showing. Because Plaintiffs' partial consent allowed

44

Aledo to evaluate Annie in all areas of suspected disability, it was valid consent. AISD thus should have proceeded with the initial evaluation to which Annie's parents consented, so that Annie could begin the services she needs and is entitled to.

***

"The intent of the IDEA 'was more to open the doors of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside.'" ROA.464 (quoting *Rowley*, 458 U.S. at 192). Yet under the district court's interpretation of the IDEA, AISD has been permitted to close doors to public education that Annie is rightfully entitled to under the IDEA. Annie's parents reasonably considered the tests that AISD intended to give Annie and asked that two of them not be used. AISD admitted it might not ultimately use those tests in the evaluation but refused to take them off the table. That was wrong, and it has now resulted in Annie being denied services for over two years. This Court should reverse and remand with instructions that the district court order AISD to conduct an initial evaluation in accordance with Plaintiffs' partial consent.

45

## II. The district court erred in determining that AISD did not violate the ADA.

The IDEA is not the only statute that protects children like Annie. The ADA does, too. And AISD violated the ADA by denying Annie a reasonable, requested modification to testing that would account for her disability, and in turn denying her access to services as a result. But the district court glossed over Annie's ADA arguments by improperly conflating IDEA compliance with compliance under the ADA. That squarely contradicts the statute and Supreme Court precedent. Moreover, the district court required plaintiffs to prove *intentional* discrimination, which is not necessary to seek injunctive relief under the ADA. This Court should, at a minimum, reverse the judgment in favor of Aledo on the ADA claim and remand for further proceedings under the proper standard. But this Court can also apply the proper standard itself and determine Plaintiffs are entitled to summary judgment on their ADA claim.[18]

---

[18] The below analysis applies equally to Plaintiffs' claim under Section 504 of the Rehabilitation Act, which provides that "[n]o otherwise qualified individual with a disability ... shall ... be excluded from the participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *See* 29 U.S.C. § 794(a). "Claims brought under § 504 or the ADA, or both,

## A. The district court erroneously conflated IDEA compliance with ADA compliance.

Individuals with disabilities are a "discrete and insular minority," that have faced restrictions and limitations "resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society." *Guckenberger*, 974 F. Supp. at 134 (quotation marks omitted). An ADA claim requires a plaintiff to show: "1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability." *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011) (per curiam). An ADA claim can also be brought under a "failure-to-accommodate" theory, which requires the Plaintiff to show "(1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations." *Smith v. Harris County*, 956 F.3d 311, 317 (5th Cir. 2020) (quoting *Ball v. LeBlanc*, 792 F.3d 584, 596 n.9

---

are subject to the same analysis." *T.O. v. Fort Bend Indep. Sch. Dist.*, 2 F.4th 407, 416 (5th Cir. 2021).

47

(5th Cir. 2015)). Statute and recent Supreme Court caselaw could not be clearer: These elements are distinct from an IDEA claim and require a distinct analysis.

Start with the statute. The IDEA states "[n]othing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities," with the exception of certain exhaustion requirements not relevant here. 20 U.S.C. § 1415(*l*). This is unambiguous. Compliance with the IDEA cannot be construed to limit ADA rights.

The Supreme Court reiterated this principle just last term. In *A.J.T.*, the Supreme Court evaluated an attempt by lower courts "to try to 'harmonize' the IDEA's specific guarantee of a free appropriate public education, on one hand, with more broadly applicable antidiscrimination laws on the other." 605 U.S. at 346. Specifically, the Court examined a lower court ruling that applied a heightened bar for proving intent under the ADA or Rehabilitation Act for violations "based on educational services for disabled children"—a bar that did not apply to other suits

48

under those statutes—because of the relationship of such suits to the IDEA. *Id.* at 342-43 (quotation marks omitted). The Court explained that such a rule "effectively read the IDEA to implicitly limit the ability of children with disability to vindicate their independent ADA and Rehabilitation Act rights," which "is irreconcilable with the unambiguous directive of § 1415(*l*)." *Id.* at 348.

The district court, operating without the insight of *A.J.T.*, violated this fundamental rule twice over, conflating IDEA compliance with ADA compliance in two ways.

First, the district court determined that Annie "has not been determined to meet the definition of an individual with a disability for the purposes of the ADA" because the *school* had not conducted an evaluation of her under the IDEA. ROA.470. Respectfully, the school's evaluation has absolutely nothing to do with whether Annie is a qualified individual under *the ADA*. Instead, a "qualified individual with a disability" under the ADA is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility

49

requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). And a "disability" is defined as one of three things: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment … ." *Id.* § 12102(1); *see also* 28 C.F.R. § 35.108(a)(1) (similar); 28 C.F.R. § 35.108(a)(2)(i) ("The definition of 'disability' shall be construed broadly in favor of expansive coverage … .").

As explained further, *infra* Section II.C, Annie's Down syndrome diagnosis easily meets this definition. But, perversely, the district court determined Plaintiffs have not shown that Annie has a disability because the school has not yet evaluated her. Whatever the lack of an initial evaluation may mean for the purposes Annie's entitlement to services under the IDEA, it has no import to whether Annie is a qualified individual under the ADA. To conclude otherwise would allow the IDEA to "limit the ability of children with disabilities to vindicate their independent ADA … rights," in violation of Supreme Court precedent and statute. *A.J.T.*, 605 U.S. at 348.

Second, and even more brazenly, the district court held that AISD did not "violat[e] the ADA by discriminating against A.M. *because of* its compliance with IDEA." ROA.470 (emphasis added). The Court reiterated that its ADA-compliance holding was simply based on its IDEA-compliance holding in the following paragraph: "AISD's compliance with the IDEA cannot constitute intentional discrimination [under the ADA] when a FIIE that evaluates a student in all areas of suspected disability is the first step in making an eligibility determination and in developing an IEP." ROA.471.

This overly simplistic reasoning is reversible error. Because, in the district court's eyes, AISD complied with IDEA, the court determined that AISD *a fortiori* "cannot" have violated the APA. ROA.471. Plaintiffs of course dispute the premise that AISD complied with IDEA for the reasons in the prior section. But, even if this Court agrees with the district court that AISD did not violate the IDEA, that has no bearing on the question of discrimination under the ADA. The district court's conclusion otherwise, and its lack of any independent reasoning under the ADA, compels reversal under the plain text of § 1415(*l*) and the Supreme Court's recent guidance in *A.J.T.*

51

**B. This district court wrongly required proof of intentional discrimination.**

The district court's dismissal of the ADA claim was flawed in another respect: It required proof of *intentional* discrimination. Specifically, the court held that "[e]ven assuming *arguendo* that Plaintiffs have established a violation of the ADA, … the Court would still find Plaintiffs' ADA claim fails because the administrative record before the Court is completely devoid of intentional discrimination." ROA.471. But, even if the court were correct that there was no evidence of intent (which it is not), that would not doom Plaintiffs' ADA claim—only their request for compensatory damages.

None of the three elements of Plaintiffs' ADA claim detailed above—(1) a qualifying disability, (2) knowledge by AISA, and (3) failure to make reasonable accommodations, *Smith*, 956 F.3d at 317—requires showing intent.[19] True, "[s]uits for money damages under [the ADA] require more." *Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F.3d 565, 574 (5th Cir. 2018). Namely, "[a] plaintiff can recover money

---

[19] The same is true for the more general ADA elements, outside a reasonable-accommodation context: (1) a qualifying disability, (2) denial of services or other discrimination, and (3) that the discrimination be based on the disability. *Hale*, 642 F.3d at 499.

damages only if he proves" both that "the defendant committed a violation of the ADA … and that the discrimination was intentional." *Id.* But this second requirement is not necessary to show a violation of the ADA itself, or to obtain non-monetary, equitable relief like an injunction or declaration. *See, e.g., T.O. v. Fort Bend Indep. Sch. Dist.*, 2 F.4th 407, 417 (5th Cir. 2021) ("[A] plaintiff seeking only equitable relief may succeed on a disparate impact theory."); *King v. Our Lady of the Lake Hosp., Inc.*, 455 F. Supp. 3d 249, 256-57 (M.D. La. 2020) ("A plaintiff seeking injunctive relief under [the ADA] is not required to demonstrate intentional discrimination."); *see also A.J.T.*, 605 U.S. at 344 (noting that "the general approach of the courts of appeals" is to "permit[] plaintiffs to establish a statutory violation and obtain injunctive relief under the ADA … without proving intent to discriminate").

Plaintiffs sought multiple forms of equitable relief including a "declar[ation] that Defendant has violated … Title II of the ADA"; "a Declaratory Judgment … declaring the actions, policies, and practices as alleged herein violate … Title II of the ADA"; an injunction requiring "AISD to accept partial consent which eliminates specific tests within a category of testing (*e.g.*, formal IQ tests within the broader category of

cognitive testing) when there are other assessments or tools available that the parents consent to"; and an injunction directing "AISD to provide compensatory services[ or] private placement." ROA.27-28. The district court provided no reason why the entire "ADA claim fails" based on the purported lack of "intentional discrimination" given the requests for declaratory and injunctive relief. ROA.471 (citing only one case which addressed "[a] plaintiff seeking compensatory damages" (quoting *Chupka ex rel. C.C. v. Pflugerville Indep. Sch. Dist.*, 2022 WL 1056101, at \*2 (5th Cir. Apr. 8, 2022) (per curiam)). On the contrary, once "Plaintiffs have established a violation of the ADA," ROA.471, they are entitled to this relief.

## C.    AISD violated the ADA.

For the reasons above, the district court's judgment in favor of AISD on the ADA claim cannot be affirmed on the basis the court provided. The district court conducted almost no reasoning under the ADA, conflating compliance with IDEA and compliance with the ADA.[20] And it required proof of "intentional discrimination" to support the entire ADA claim,

---

[20] For the reasons in Section I, Plaintiffs contend the IDEA-compliance holding should also be reversed, which would undermine the district court's holding on its own terms.

when the requested injunctive relief does not require any such showing. This Court should therefore, at a minimum, reverse and remand so the district court can evaluate the ADA claim under the proper framework in the first instance. Particularly since this matter is based on an agency record and thus subject to de novo review, however, this Court can apply the proper standard and resolve the ADA claim itself. *See Glass v. Paxton*, 900 F.3d 233, 243 (5th Cir. 2018) (explaining that "the matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases" and that "[w]hen the only remaining issues are purely legal questions that were briefed below, [the Fifth Circuit] ha[s] been willing to resolve those issues on appeal to avoid a waste of judicial resources" (cleaned up)). Such an evaluation dictates summary judgment in favor of Plaintiffs.

Again, to show AISD violated the ADA, Plaintiffs must only show a qualifying disability, denial of the benefit of services, and that their disability was the reason for the discrimination. *Hale*, 642 F.3d at 499. And the ADA "impose[s] upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." *Bennett-*

55

*Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005). In the context of a failure to accommodate claim, like this one, the test of ADA liability is met where a plaintiff shows "(1) [s]he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations." *Smith*, 956 F.3d at 317 (quoting *Ball*, 792 F.3d at 596 n.9). To receive a compensatory damages award (but not to obtain injunctive relief), Plaintiffs must also show "that the discrimination was intentional." *Miraglia*, 901 F.3d at 574. All of those elements are met here.

*First*, it should go without saying that Annie—who has been diagnosed with Down syndrome[21]—is a qualified individual under the ADA. Even if this documented and conceded diagnosis does not conclusively prove a "mental impairment that substantially limits one or more of the major life activities"—and it likely does—at a minimum the documentation of her Down syndrome satisfies the alternative definitions of "disability": "a record of such an impairment; or … being

---

[21] The record is replete with Annie's diagnosis. *See* ROA.532. Even AISD concedes Annie has "a medical diagnosis of Down Syndrome." ROA.274.

regarded as having such an impairment." 42 U.S.C. § 12102(1). Unsurprisingly, courts regularly recognize that Down syndrome qualifies as a disability under the ADA. *See, e.g.*, *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 700 (7th Cir. 2014) ("Reeves has Down syndrome, a genetic disorder which varies in severity, but causes lifelong intellectual disability and developmental delays." (quotation marks omitted)).

*Second*, Annie's "disability and its consequential limitations were known by" AISD. *Smith*, 956 F.3d at 317 (quoting *Ball*, 792 F.3d at 596 n.9). "Plaintiffs ordinarily satisfy the knowledge element by showing that they identified their disabilities as well as the resulting limitations to a public entity or its employees and requested an accommodation in direct and specific terms." *Id.* Here, Annie's parents could hardly have been more communicative. They told the school district that Annie has Down syndrome, *see* ROA.532; explained that her disability limited her ability to submit to IQ testing because such testing would be neither proper nor accurate, *see* ROA.1406 (Tr. 44:8-11); ROA.1415 (Tr. 53:23-25) (Annie's mother explaining that "the assessments listed were the Wechsler [WPPSI] and the Woodcock-Johnson [ECAD], which [AISD's

57

diagnostician] had specifically said she didn't even think were possible to administer to [Annie]"); and requested that the district commit to evaluating her through available, alternative means, ROA.1415 ("We agreed to all of the forms of cognitive testing that were deemed appropriate by [AISD's diagnostician], the DAYC and the parent checklist"). The second element is met.

*Third*, AISD "failed to make reasonable accommodations." *Smith*, 956 F.3d at 317 (quoting *Ball*, 792 F.3d at 596 n.9). An accommodation request is "reasonable" so long as "it does not impose undue financial or administrative burdens or 'fundamentally alter the nature of the service, program, or activity.'" *Cadena v. El Paso County*, 946 F.3d 717, 724 (5th Cir. 2020) (quoting 28 C.F.R. § 35.130(b)(7)). Aledo has no basis to suggest that removing a small subset of tests from the initial evaluation would pose *any* financial or administrative burden on the district, let alone an undue one. Nor, for reasons described above, would it fundamentally alter the nature of the evaluation—others means of testing for the same areas of disability are available to the district, and indeed used by it. *See* ROA.1415 (Tr. 53:23-25) (describing AISD's diagnostician's own recommendation that the DAYC-2 and parent

58

checklist would be other means of cognitive testing that could be used on Annie). In fact, the school's own diagnostician agreed that such testing would be unnecessary and inappropriate. *See* ROA.1415 (Tr. 53:23-25); *see also* ROA.133-34. And it goes without saying that accommodating Annie's disability by declining to use IQ testing doesn't alter the nature of the special education programming itself.

Because those three elements of a reasonable accommodation claim are met, Plaintiffs are—without more—entitled to summary judgment on their ADA claim for injunction relief. But Plaintiffs have also shown, *fourth*, that the discrimination was intentional. This Court has declined to "delineate the precise contours" of intent, but it has indicated (contrary to other Courts of Appeal) that it requires showing "something more than 'deliberate indifference.'" *Miraglia*, 901 F.3d at 575 (quotation marks omitted). Whatever the contours, the standard is met here. This Court has, for example, "affirm[ed] damages based on a defendant's knowledge of the plaintiff's disability and his decision not to accommodate him." *Id.* (citing *Delano-Pyle v. Victoria County*, 302 F.3d 567, 575 (5th Cir. 2002)); *see also A.J.T.*, 605 U.S. at 345 ("ADA and Rehabilitation Act claims based on educational services should be subject to the same standards [of

intent] that apply in other disability discrimination contexts."). Because this additional element is met, the Court should award summary judgment for Plaintiffs on their ADA claim for damages, too.

## Conclusion

The Court should reverse the grant of summary judgment to AISD and remand this case to the district court with instructions to enter summary judgment in favor of the Plaintiffs, or in the alternative for further proceedings.

Respectfully submitted,

_s/Sarah V. Warburg-Koechlin_

|  |  |
|---|---|
| Caroline Jozefczyk | Sarah V. Warburg-Koechlin |
| KING & SPALDING LLP | *Counsel of Record* |
| 1401 Lawrence Street | KING & SPALDING LLP |
| Suite 1900 | 2601 Olive Street |
| Denver, CO 80202 | Suite 2300 |
| (912) 596-0282 | Dallas, TX 75201 |
| cjozefczyk@kslaw.com | (214) 764-4410 |
|  | swarburg-koechlin@kslaw.com |

Nicholas A. Mecsas-Faxon
KING & SPALDING LLP
1700 Pennsylvania Ave. NW
Washington, DC 20006
(202) 737-0500
nmecsas-faxon@kslaw.com

*Counsel for Plaintiffs-Appellants*

September 30, 2025

60

## Certificate of Service

I hereby certify that on September 30, 2025, an electronic copy of the foregoing Opening Brief was filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system, and that service will be accomplished by the appellate CM/ECF system upon the following registered CM/ECF users:

Meredith Walker          mwalker@wabsa.com

Kelly Janes              kjanes@wabsa.com

*s/Sarah V. Warburg-Koechlin*
Sarah V. Warburg-Koechlin
*Counsel for Plaintiffs-Appellants*

## Certificate of Compliance

The undersigned counsel for Plaintiffs-Appellants certifies that:

1.    No privacy redactions were required in this brief.

2.    Any required hard copies of this brief are exact copies of the ECF filing dated September 30, 2025.

3.    The ECF submission was scanned for viruses with the most recent version of MS Windows Defender, and, according to the program, is free of viruses.

4.    This brief complies with the word limits of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 11,915 words.

5.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: September 30, 2025

_s/Sarah V. Warburg-Koechlin_
Sarah V. Warburg-Koechlin
*Counsel for Plaintiffs-Appellants*